Shyamala RAJENDER, on behalf of herself and a class of academic non-student employees and applicants at the University of Minnesota, Plaintiffs,

and

Phyllis Kahn, Florence K. Gleason, Silvia Azar, Bertila Herrera and Carol Gold, Plaintiff Intervenors,

v.

The UNIVERSITY OF MINNESOTA and the Regents of the University of Minnesota, Defendants.

Civ. No. 4–73–435.

United States District Court, D. Minnesota, Fourth Division.

July 24, 1982.

---

49. *See* 3 Nimmer § 12.04[A], p. 12–40–41.

Sprenger, Olson & Shutes, P. A. by Paul C. Sprenger; Hvass, Weisman, & King by Robert J. King; Johnson, Sands, Lizee, Fricker & McCloskey, Minneapolis, Minn., for plaintiffs.

Leonard, Street & Deinard by Charles A. Mays, Minneapolis, Minn., for defendants.

## MEMORANDUM OPINION AND ORDER

MILES W. LORD, Chief Judge.

### I. *Introduction*

This petition for attorneys' fees derives from a class action originally brought by Dr. Shyamala Rajender against the University of Minnesota. The plaintiff filed her complaint on September 5, 1973, and her Second Amended Complaint on September 6, 1975, alleging that the defendants were engaged in employment discrimination based upon sex and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, and 42 U.S.C. §§ 1981 and 1983. Jurisdiction is premised upon 28 U.S.C. § 1343.

During the University judicial proceedings which preceded the filing of her complaint and at the actual initiation of the lawsuit, Dr. Rajender was represented by two attorneys other than petitioners. On May 1, 1975, Paul Sprenger was substituted as attorney for the plaintiff and motions were then made to reopen discovery, which the defendants contended had closed on October 31; 1974, and for leave to file a second amended complaint. At that time Paul Sprenger and Terry Cosgrove, also one of the attorneys for Dr. Rajender, were members of the Johnson & Sands Professional Association.

In June of 1977, prior to presenting class action issues to the Court for formal class determination, the plaintiff's attorneys presented a settlement proposal to the University which was rejected by the defendants.

In late 1977, Paul Sprenger, Eric Olson and Robert Shutes left the Johnson & Sands firm and in January of 1978 filed a notice of appearance of Sprenger, Olson & Shutes, P. A., as co-counsel with Johnson, Sands, Lizee, Fricker & McCloskey.

On February 13, 1978, pursuant to a motion for class determination, the Court entered an Order establishing that the action be maintained as a class action on behalf of,

all women academic non-student employees who have been employed by the University of Minnesota at any time after

March 24, 1972, women who have applied for but were denied employment by the University in such positions after that date or women who would have applied for such positions but for the discriminatory policies and practices of the University; all present women academic non-student employees; and all women who may in the future be employed in academic non-student positions or may in the future apply for but be denied such employment."

On April 24, 1978, the Court commenced a pilot trial of the Rajender claims and the sex-based claims of a subclass consisting of that portion of the class in the University's Chemistry Department on the Twin Cities campus. At the end of May 1978, the trial was recessed to enable the parties to explore the possibility of settlement. Following extensive negotiations between plaintiff's attorney Sprenger and defendants' attorney Mays, a proposed agreement of approximately 50 pages was produced, for the parties' approval. The proposal was rejected by the University administration for lack of faculty support.

On August 17, 1978, the University filed a motion to dismiss all of the plaintiff's claims under Rule 41(b), Fed.R.Civ.P. The lawyers, during this same period, again reached agreement on a 45 page proposed settlement; however, the document was ultimately rejected by a unanimous vote of the Regents of the University in the fall of 1978.

On August 14, 1979, the Court issued a Memorandum Order granting the defendants' motion to dismiss plaintiff's claims under Executive Orders 11141 and 11246 and under 42 U.S.C. § 1983, but denying the defendants' motions to dismiss claims asserted under Title VII and 42 U.S.C. § 1981. In the same Order, the Court denied the plaintiff's motion for summary judgment in favor of the Chemistry Department subclass.

During this same period, the plaintiff's attorney Terry Cosgrove accepted employment with a law firm in Chicago. On October 8, 1979, an amended notice of appearance was filed, indicating that the Sprenger firm and its members would continue to assume the obligations of representation of the plaintiff and class and that Terry Cosgrove and the Johnson, Sands firm would withdraw as counsel for the class but remain as counsel for Dr. Rajender in the pilot trial, reserving rights to seek an appropriate cost and fee award under Title VII.

The parties continued discovery in preparation for the recommencement of trial and on or about November 13, 1979, the trial was reconvened and continued until approximately January 4, 1980. In late December 1979, the Court granted the plaintiff's motion seeking the intervention of five additional plaintiffs: Phyllis Kahn, Florence K. Gleason, Silvia Azar, Bertila Herrera, and Carol Gold. In all, the two phases of trial of the action took place over eleven weeks and involved the testimony of 25 witnesses and the submission of 347 exhibits. Pretrial proceedings required the briefing and argument of approximately seventeen motions, as well as numerous hearings and pretrial conferences with the Court.

On or about January 11, 1980, the parties began a third round of settlement discussions which eventually produced the Consent Decree approved by this Court on August 13, 1980. The Consent Decree provides in Part XI (page 17 of the printed copy) that the "University agrees to and shall pay the reasonable attorneys' fees, costs and disbursements (including reasonable charges of expert witnesses) incurred by the plaintiff and class members in this action." By order and stipulation dated July 17, 1980, the University agreed that any fee award would bear interest at the rate of eight percent (8%) per annum compounded yearly, running from August 1, 1980. At the "fairness hearing," the commencement date for the running of interest was deferred until the date the Consent Decree was approved by the Court. Transcript, August 1, 1980, Fairness Hearing, pp. 224–25. Therefore, any fee award will bear interest as stated from August 13, 1980, the date the decree was approved.

## II. *The Fee Request*

The full request before this Court is $1,958,050.87. The total amount consists of $1,738,544.50 for attorneys' fees and costs related to the case on its merits, together with post-settlement administration, and $219,506.37 for preparing and compiling the fee application. Sprenger, Olson & Shutes claims $1,405,607.78 and Terry M. Cosgrove and Johnson, Sands, Lizee, Fricker & McCloskey claim $552,443.09 for their respective fees and expenses in this matter. The Sprenger firm's total of $1,405,607.78 is based on the following table:

**ATTORNEYS' FEES:**

| | |
|---|---:|
| A. Base fee for time spent on merits (pre-settlement hours less pre-settlement application hours) (2,980.25 hours at $125/hour): | $ 372,531.25 |
| B. Increase of 1.00 for risk on the merits: | 372,531.25 |
| C. Increase of 1.00 for quality on the merits: | 372,531.25 |
| D. Base fee for time spent on post-settlement administration (502.75 hours at $125/hour): | 62,843.75 |
| E. Base fee for time spent on application (pre- and post-settlement application) (1,066.75 hours at $125/hour): | 133,343.75 |
| TOTAL FEES: | $1,313,781.25 |

**EXPENSES:**

| | |
|---|---:|
| A. Legal assistants and law clerks: | Treated as Overhead |
| B. Expenses incurred on the merits: | 52,228.38 |
| C. Expenses incurred on administration post-settlement: | 3,498.62 |
| D. Expenses incurred on application: | 36,099.53 |
| TOTAL EXPENSES: | $ 91,826.53 |
| Total requested fees and expenses reimbursement of Sprenger, Olson & Shutes, P. A.: | $1,405,607.78 |

The Terry Cosgrove and Johnson & Sands total of $552,443.09 is based on the following table:

**ATTORNEYS' FEES:**

| | |
|---|---:|
| A. A base fee for time devoted to the case on its merits (2,093.25 hours at $80/hour): | $ 167,460.00 |
| B. Increase of 1.00 for risk on the merits: | $ 167,460.00 |
| C. Increase of 1.00 for quality on the merits: | 167,460.00 |
| D. A base fee for time devoted to the application included in the Second Amended Application (244.50 hours at $80/hour): | 19,560.00 |
| E. A base fee for time devoted to the application subsequent to the preparation of the Second Amended Application (109.75 hours at $80/hour): | 8,780.00 |
| TOTAL FEES | $ 530,720.00 |

**EXPENSES:**

| | |
|---|---:|
| A. Disbursements (per initial application): | $ 2,896.57 |
| B. Paralegals (per initial application): | 1,295.00 |
| C. Disbursements billed for or incurred subsequent to the preparation of the Second Amended Application: | $ 17,531.52 |
| TOTAL EXPENSES | $ 21,723.09 |
| Total requested fees and expenses reimbursement of Terry Cosgrove and Johnson, Sands, Lizee, Fricker & McCloskey: | $ 552,443.09 |

## III. *Discussion*

### A. Fee Computation in the Various Circuits.

That Congress intended full and fair attorneys' fees to be awarded in civil rights cases is clearly manifested through the following excerpts from the legislative history of the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (Supp. VII 1977):

All of these civil rights laws [Titles II and VII of the Civil Rights Act of 1964 and Section 402 of the Voting Rights Amendment of 1975] depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.

\* \* \* \* \* \*

It is intended that the amount of fees awarded under S. 2278 be governed by the same standards which prevail in other

types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature. S.Rep.No. 1011, 94th Cong., 2nd Sess. 2, 6 (1976). Accord H.R.Rep.No. 1558, 94th Cong., 2nd Sess. 9 (1976), U.S.Code Cong. & Admin.News 1976, p. 5908, 5910.

The Court of Appeals for the District of Columbia in *Copeland v. Marshall* stated that the vindication of civil rights was so significant that the calculation of an attorney's fee should not vary with the identity of the losing defendant. Rather, the Court explained that it is more important to provide adequate fees to employment discrimination litigants who prevail against the government because the prospect of liability for an attorney's fee may help deter discrimination and thereby obviate litigation. *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980).

In order for this Court to be faithful to the intention of Congress to compensate prevailing parties in civil rights litigation as fairly and reasonably as those who prevail in other types of complex federal litigation, it is necessary to examine the fee award standards in the various circuits with some degree of particularity. There are two general approaches to computing attorney fee awards; the first is commonly known as the lodestar method. It was first set forth by the Third Circuit in *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973). Basically, this method consists of three steps: (1) multiplying the number of hours spent times the attorney's regular billing rate which results in a lodestar amount, (2) adjusting that lodestar amount for risk or contingency factors, and (3) adjusting that amount for the quality of work performed. This method was first utilized in an antitrust suit and remains popular for that type of litigation. *See Merola v. Atlantic Richfield Co.*, 515 F.2d 165 (3rd Cir. 1975); *Prandini v. National Tea Co.*, 557 F.2d 1015 (3rd Cir. 1977); *Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208 (3rd Cir. 1978); *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974); *In Re Ampicillin Antitrust Litigation*, 81 F.R.D. 395 (D.D.C. 1978).

The second approach to fee computation was announced by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Essentially, the *Johnson* approach consists of a consideration of 12 factors: (1) the time and labor required, (2) the novelty and difficulty of the question, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Initially, this approach found support in both Congress and the courts. *See Barber v. Kimbrell's Inc.*, 557 F.2d 216 (4th Cir. 1978); *King v. Greenblatt*, 560 F.2d 1024 (1st Cir. 1977). *See also* S.Rep.No. 1011, 94th Cong., 2nd Sess. 6 (1976), *reprinted* in 1976 U.S.Code Cong. & Ad.News 5908, 5913. (Legislative History to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988.) Unfortunately, while some of these factors were useful in arriving at fair fee awards, there was little direction given in relation to the application of the various factors. As a result, a number of courts criticized using the *Johnson* factors as the sole method of determining attorneys' fees. *See, e.g., Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974); *Northcross v. Bd. of Education of Memphis*, 611 F.2d 624, 642 (6th Cir. 1979), *cert. denied* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). Even the Fifth Circuit has moved away from its deference to the unguided use of the *Johnson* factors and has formally adopted an approach similar to the lodestar method. *See Copper Liquor, Inc. v. Adolph Coors Co.*, 624 F.2d 575 (5th Cir. 1980).

At first the Eighth Circuit embraced the *Johnson* method of fee computation. *Doe v. Poelker*, 515 F.2d 541, 548 (8th Cir. 1975), *rev'd on other grounds* 428 U.S. 909, 96 S.Ct. 3220, 49 L.Ed.2d 1216 (1976); *Allen v. Amalgamated Transit Union Local 788*, 554 F.2d 876, 884 (8th Cir. 1977). Apparently, because the *Johnson* method often resulted in awards which were less than the amount resulting from the number of hours claimed times the attorney's regular hourly rate, the Court moved closer to adopting the lodestar method. *Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 252 (8th Cir. 1978). *Zoll*, therefore, appears to require the District Court to employ the *Johnson* factors only to raise an award over the lodestar amount. *See also Cleverly v. Western Electric Co.*, 594 F.2d 638, 642 (8th Cir. 1979). Under unusual circumstances, however, a court may use the *Johnson* standards to reduce the fee requested by counsel. *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1276–74 (8th Cir. 1981) (extremely low quality representation); *Robinson v. Moreland*, 655 F.2d 887, 891–92 (8th Cir. 1981) (plaintiff prevailed over only one of the original defendants); *Ladies Center, Nebraska, Inc. v. Thone*, 645 F.2d 645, 647 (8th Cir. 1981) (inefficient use of time). The Eighth Circuit, therefore, has adopted a hybrid ("lodestar-Johnson") analysis for attorneys' fees.

This hybrid analysis is characterized by three recent cases. In *Jorstad v. IDS Realty Trust*, 643 F.2d 1305 (8th Cir. 1981), the Court stated:

Since the "starting point in determining attorney's fees is to arrive at a 'lodestar' figure by multiplying an hourly rate by the number of hours worked." *International Travel Arrangers, Inc. v. Western Airlines, Inc., supra*, 623 F.2d at 1274, it is particularly important that those rates which are applied be, in fact, reasonable hourly rates. In *Grunin v. International House of Pancakes, supra*, 513 F.2d [114] at 127 [8th Cir. 1975,] this court adopted the standards to be considered in calculating attorneys' fees which were previously set forth by the Third Circuit in *Lindy Bros. Builders, Inc. v. American Radiator*

*& Standard Sanitary Corp.*, 487 F.2d 161, 167–78 (3d Cir. 1973) (*Lindy I*), and reiterated in *Merola v. Atlantic Richfield Co., supra*, 593 F.2d at 297:

(a) the number of hours spent in various legal activities by the individual attorneys,

(b) the *reasonable* hourly rate for the *individual attorneys*,

(c) the contingent nature of success, and,

(d) the quality of the attorneys' work.

. . . These standards were recently reaffirmed in this circuit in *International Travel Arrangers, Inc. v. Western Airlines, Inc., supra*, 623 F.2d at 1274.

*Id.* at 1312–13.

In *Ladies Center, Nebraska, Inc. v. Thone*, 645 F.2d 645 (8th Cir. 1981), the Court of Appeals noted:

This court has expressly adopted the guidelines for attorney fees set forth by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974). *See Zoll v. Eastern Allamakee Community School District*, 588 F.2d 246, 252 (8th Cir. 1978); *Allen v. Amalgamated Transit Union, Local 788*, 554 F.2d 876, 884 (8th Cir.), *cert. denied* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977). As noted in *Zoll*, 588 F.2d at 252 n. 11:

In assessing attorney's fees, the district court should consider twelve factors: (1) the time and labor required, (2) the novelty and difficulty of the question, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation and ability of the attorneys, (10) the undesirability of the case, (11) the nature and length of the professional re-

lationship with the client and (12) awards in similar cases.

*Id.* at 647.

The lodestar analysis of *Jorstad* and the *Johnson* analysis of *Ladies Center* coalesce in *Robinson v. Moreland,* 655 F.2d 887 (8th Cir. 1981), where the Court remarks:

> The trial court correctly stated the governing legal principle: that the court should ordinarily award the number of hours claimed, multiplied by the attorney's regular hourly rate. The trial court, however, may award a lesser amount if it finds a lesser award appropriate under the factors listed in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974), provided the court states its reasons for so doing. *See Ladies Center, Nebraska, Inc. v. Thone,* 645 F.2d 645 at 647 (8th Cir. 1981).

*Id.* at 891.

■ Of course, the *Johnson* factors can still be used to raise an award over the lodestar amount. *See Cleverly v. Western Electric Co.,* 594 F.2d 638 (8th Cir. 1979); *Zoll v. Eastern Allamakee Community School District,* 588 F.2d 246 (8th Cir. 1978).

B. Analysis.

■ Since the determination of reasonable attorneys' fees must start with the calculation of a lodestar figure by multiplying the attorneys' hourly rates by the number of hours expended, it is with that process that the Court begins its analysis. *Jorstad v. IDS Realty Trust,* 643 F.2d 1305, 1312 (8th Cir. 1981); *International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1274 (8th Cir. 1980), *cert. denied* 449 U.S. 1063, 101 S.Ct. 787, 66 L.Ed.2d 605 (1980); *Grunin v. International House of Pancakes,* 513 F.2d 114, 127 (8th Cir. 1975), *cert. denied* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). The plaintiffs' attorneys have submitted a total of 5,073.50 hours expended for time devoted to the case on its merits. Of this total, 2,980.25 hours are claimed by the Sprenger firm at a rate of $125. per hour, and 2,093.25 are claimed by the Johnson, Sands firm at $80. per hour. Therefore, the calculations yield a lodestar

figure of $372,531.25 for the Sprenger firm and a lodestar figure of $167,460.00 for the Johnson, Sands firm.

These lodestar figures represent base fee amounts upon which a determination of the reasonableness of the number of hours expended and the hourly rates is centered. *See, e.g., Ladies Center, Nebraska, Inc. v. Thone,* 645 F.2d 645, 647 (8th Cir. 1981); *Jorstad v. IDS Realty Trust,* 643 F.2d 1305, 1313 (8th Cir. 1981).

The defendants in the instant case, while not suggesting that the number of hours submitted in the affidavits of class counsel were not spent, challenge the reasonableness of the hours on the following grounds:

1) the appropriateness of some of the time entries;

2) the use of senior attorneys to perform associate-type tasks;

3) the use of attorneys to perform paralegal and clerical tasks; and

4) the duplication of effort of class counsel.

(Defendants' Pre-hearing Memorandum Re Fee Application Proceedings, pp. 26 and 27.)

■ In addition, the defendants correctly point out that the number of hours claimed by class counsel should not be the sole basis for determining a fee; rather, the Court "should weigh the hours claimed against his own knowledge, experience, and expertise of the time required to complete similar activities." *Johnson,* 488 F.2d at 717.

■ The *Johnson* court also counsels against awarding fees based on an attorney's normal hourly rate when the work done by that attorney could and should have been accomplished by non-lawyer assistants. *Johnson,* 488 F.2d at 717. The defendants in the instant case carefully reviewed the time charts submitted by class counsel and, as a result, vigorously protest the inclusion of time spent on tasks such as "filing" or "xeroxing" in the number of hours for which counsel seek compensation at their normal billing rates. This Court, in an attempt to adhere to the *Johnson* guidelines, embraced by the Court of Appeals for

the Eighth Circuit, independently reviewed the summary of time put in evidence by class counsel and finds some merit in the defendants' challenge. It is the opinion of this Court that items such as "serving subpoenas," "xeroxing," and "filing," when they are single entries and not done in conjunction with the reviewing of documents, should more correctly be treated as non-legal tasks and are, therefore, not compensable at the attorney's normal billing rate and not includable in the calculation of the lodestar. As a consequence, the number of hours listed by each firm will be adjusted accordingly.

In questioning what they perceive as the duplication of effort reflected by the time summaries submitted by class counsel, the defendants seem to have acquired the omniscience that is characteristic of hindsight. According to the defendants' Pre-hearing Memorandum Re Fee Application Proceeding, "the amount of duplicated time by class counsel in this case would be 10% of the total hours recorded by each class counsel." (Defendants' Memo at p. 37.) This Court has carefully scrutinized both the time charts of class counsel and the defendants' Table of Time Overlap and finds that the defendants have failed to substantiate their challenge. In certain instances, for example, the defendants allege duplication of time where attorneys Cosgrove and Sprenger attended conferences with three attorneys who were representing the University. If the University is so solidly represented on these occasions, is it not proper for the class to be equally represented by its cocounsel of record? Zealously representing one's client does not include drawing straws to see who goes to crucial settlement talks in the event clients don't prevail and counsel won't be adequately recompensed. In some situations, the time charged may be duplicative, but the defendants have failed to proffer evidence to show that the duplication of time was *unnecessary.* Based upon this Court's knowledge of the complexity of the issues involved and the expertise required to represent a client adequately in litigation of the instant sort and also based upon a careful examination of the summaries submitted, it appears that class counsel utilized their time reasonably and properly, with the sole exception of the aforementioned inappropriate time charges.

Therefore, as reflected in the foregoing discussion, it is the opinion of this Court that the correct number of hours to be included in the "lodestar" computation for the Johnson, Sands firm is as follows:

| | |
|---|---|
| Total hours for time devoted to the case on its merits: | 2,093.25 |
| Less: inappropriate time charges: | 6.75 |
| TOTAL LODESTAR HOURS | 2,086.50 |

The calculation for the Sprenger firm is as follows:

| | |
|---|---|
| Total hours for time devoted to the case on its merits: | 2,980.25 |
| Less: inappropriate time charges: | 2.25 |
| TOTAL LODESTAR HOURS | 2,978.00 |

The second element of the lodestar calculation upon which the Court now focuses its inquiry is the reasonable hourly rate. The Court of Appeals for the Eighth Circuit in *Jorstad* defined "reasonable hourly rate" as the "hourly amount to which attorneys of like skill in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation." *Jorstad* at 1313, quoting from *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974).

In an attempt to establish the reasonableness of their respective charges, counsel for the class have submitted numerous affidavits from law firms in the area which state generally the range of hourly rates of partners and associates in the firms. While these sworn statements are indeed helpful to the Court in arriving at a determination of a reasonable fee in the instant case, the inability to explore the territory with any degree of particularity makes it difficult to ascertain the whole truth concerning what the various law firms regard as personal, private and proprietary information. It

would seem that the effective means by which to explore fully the hourly rates to determine the true nature thereof would be to order a thorough audit made of the billing practices of a large law firm. While there is no doubt that such audits are in existence, none have yet been obtained by class counsel in this or other related litigation concerning attorneys' fees. To have the Court order such an audit for purposes of the matter now before it would be "unthinkable," and yet this Court's timidity should not be allowed to frustrate the rightful claims of counsel herein.

Judging from the limited material which class counsel were able to obtain, it would appear that there is a substantial difference in the manner in which the several law firms determine what is to be their hourly rate. There is ample evidence to conclude that many of the large law firms simply do not have an hourly rate as such. Rather they have an ideal rate which serves as a plateau upon which to pyramid their fees. It is extremely difficult to conclude from the evidence given that the so-called hourly rates are, in fact, the rates at which clients are actually charged. There seems to be little, if any, prospect that a "well-heeled" client defending important litigation will pay his defense counsel at the rates stated. Although it seems that in those instances where the charge is higher than the regular rate, it is referred to as an anomaly, the net result is that the average hourly earnings of most of the lawyers who have submitted affidavits can be substantially greater than their so-called standard rate. (Transcript

of Attorney Fee Hearing, February 17, 1982. Testimony of Frank Hammond, PP 99–105.)

■ This observation, of course, calls into question the validity of the base fee or lodestar figure itself, but the general acceptance by appellate courts of this method of calculating fees mandates its use by this Court.

The summary submitted by class counsel of attorneys' hourly rates, based on affidavits and testimony from 18 litigation entities, excluding the Sprenger firm, reflects the following actual rates [1] charged by attorneys in the Twin Cities:

|  | Range | Median |
| --- | --- | --- |
| Senior Attorneys: (hourly rates) | $130–$300 [2] | $150 [3] |

|  | Range | Average |
| --- | --- | --- |
| Associates: (hourly rates) | $ 60–$100 | $85.40 |

Of the 18 litigation entities represented in class counsel's summary, the Sprenger firm has litigated *against* 15 and been retained *with* six as counsel for co-parties in federal litigation. Nine of the 16 private law firms represented have been retained by the defendant, which paid hourly rates of $150 or more during 1980 and 1981. Together, the 17 private law firms questioned for counsel's summary employ about 23% (675 +) of the Twin Cities private attorneys. (Exhibit 12 of Sprenger, Olson & Shutes.) Affidavits and fee schedules submitted by the Sprenger firm indicate that

1. The Sprenger firm explains its use of "actual rates" in the following way:

"Actual rates/senior attorney" is used as in *Jorstad v. IDS Realty Trust* (CCA–8, 1981), 643 F.2d 1305, to indicate the actual rate charged for one or more of the senior attorneys in the particular firm. The rates are after the application of the firm's mode of markup over its cost, recovery or minimum internal rates. *Jorstad* found the high end rates actually charged for partners admitted 12 to 24 years to be reasonable for all partners admitted 9 to 35 years.
Applicant Sprenger firm partners were admitted 10 to 16 years as of 1981.
"Actual rates/associates" is used as in *Jorstad, ibid.*, to indicate the actual rate charged

for one or more of the associates in the particular firm. *Jorstad* found the average rate charged for the senior associate in the case, who was admitted 3 years, to be reasonable for all associates admitted less than 1 to 3 years.
Applicant Johnson, Sands' associate Cosgrove was admitted 5 years when he left in 1979.

2. This rate represents the average of $200–400, a range submitted by one affiant.

3. This Court elected to use the median here rather than the average because of the skewed distribution of the hourly rates.

its own actual rates range from $125–$225 an hour.

Vance Opperman, a partner in the firm of Opperman & Pacquin, which most closely resembles Sprenger, Olson & Shutes among the firms surveyed, was called as an expert witness by class counsel at the fee hearing on February 17, 1982. According to the expert's testimony, class counsel's summary of local rates accurately reflected his knowledge of hourly charges in the Twin Cities area and, in his opinion, the $125 per hour charged by the Sprenger firm and the $80 per hour charged by the Johnson, Sands firm were quite reasonable. The witness commented on the fact that the structure of the Sprenger firm [4] would tend to increase its efficiency because the experienced, senior attorneys would be able to accomplish more work in fewer hours without going through a hierarchy of lawyers. As a result, the client would be getting the extra benefit of more senior attorney hours for much less money. The expert commented additionally that the $80 rate for the Johnson, Sands firm was exceptionally reasonable considering the fact that the majority of the work was done by Mr. Cosgrove, an experienced senior associate, and the fact that the senior partners Fricker and Lizee billed at Mr. Cosgrove's rate because their time was primarily spent on post-trial and fee application matters.

A Court-appointed expert witness, Mr. Frank Hammond of the Briggs & Morgan firm, testified that he found the hourly rates for the Sprenger firm and the Johnson, Sands firm reasonable. When cross examined by the defendants' counsel about additional, independent research he might have done on hourly rates customarily charged by Twin Cities lawyers with comparable experience, the witness responded by saying that he had made no effort to do so because he assumed that any attorneys who had lasted eight years against the University of Minnesota were probably zero in number. Mr. Hammond also stated that in his opinion the *total* fee request was reasonable.

■ Therefore, based upon the documents submitted, and the testimony of the expert witnesses, it is the opinion of this Court that the hourly rates of $125 for the Sprenger firm and $80 for Cosgrove and the Johnson, Sands firm are reasonable and are perhaps on the low side of the actual hourly rates charged by the attorneys in the area.

In sum, the total lodestar figure requested by class counsel is $539,991.25, consisting of $372,531.25 for the Sprenger firm (2,980.25 × $125) and $167,460.00 for Cosgrove and the Johnson, Sands firm (2,093.25 × $80). The Sprenger firm's lodestar figure is reduced for the reasons stated above from $372,531.25 to $372,250.00 (2,978.00 × $125). The Cosgrove-Johnson, Sands lodestar figure is reduced for reasons stated above from $167,460.00 to $166,920.00 (2,086.50 × $80). The adjusted lodestar figure for attorneys' fees on the merits now totals $539,170.25.

It is at this juncture that the Court proceeds to a consideration of the contingent nature of success (risk) and quality factors present in the case. Counsel for the class have requested a multiple of 1.0 for risk and contingency and 1.0 for quality, so that in effect each firm is requesting three times the lodestar figure for the time expended through the signing of the Consent Decree. The Court of Appeals for the Eighth Circuit has joined other circuits in recognizing that the party requesting an increase bears a heavy burden in proving an entitlement to that increase. *Jorstad v. IDS Realty Trust,* 643 F.2d 1305, 1314 (8th Cir. 1981); *International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255, 1276 (8th Cir. 1980).

■■ Under the broad heading of "contingent nature of success" this Court must examine the essence of the burden undertaken by class counsel, to wit, the likelihood of success, viewed at the time of filing suit. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d

---

4. The Sprenger firm consists of three attorneys all of whom are equally responsible for maintaining clients and meeting the financial obligations of the firm.

102, 117 (3rd Cir. 1976). This analysis must include an evaluation of the following factors:

1) the complexity and/or novelty of the legal issues involved;

2) the difficulty of proving the claims;

3) the number of hours of work expended without the guarantee of remuneration;

4) the amount of out-of-pocket expenses advanced; and

5) the delay in receipt of payment for services rendered.

*Lindy, supra* at 117.

At the beginning of this litigation, counsel were faced with the possibility of recovering attorneys' fees only if the Court ruled in favor of the plaintiff (and class) on the merits, and then only if the Court deemed an award of attorneys' fees appropriate under the circumstances. To add to the uncertainty, even if the plaintiff prevailed at trial, there was no guarantee that the judgment would have been affirmed on appeal. The defendant in this case, the University of Minnesota, was at that time, and still is today, an internationally known and respected academic institution and one of the largest employers in the State of Minnesota. The financial resources on which the University could draw to defend itself against such claims were enormous in comparison to the resources of the plaintiff.

In addition, claims brought by women against academic institutions alleging discrimination in faculty employment were, at the time this action was filed, a novelty. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, which prohibits discrimination in employment on the basis of sex, race, and other grounds became applicable to educational institutions on March 24, 1972, only 18 months before Dr. Rajender filed suit. The notable lack of success in subsequent actions of this sort underlines the risk inherent in such a claim. *See, e.g., Faro v. New York University*, 502 F.2d 1229 (2nd Cir. 1974); *Powell v. Syracuse University*, 580 F.2d 1150 (2nd Cir. 1978); *Presseisen v. Swarthmore College*, 442 F.Supp. 593 (E.D.Pa.1977), *aff'd* 582 F.2d 1275 (3rd Cir.

1978); *Keyes v. Lenoir Rhyne College*, 552 F.2d 579 (4th Cir. 1977); *Green v. Bd. of Regents of Texas Tech University*, 474 F.2d 594 (5th Cir. 1973) (a suit under 42 U.S.C. § 1983); *Cohen v. Illinois Institute of Technology*, 524 F.2d 818 (7th Cir. 1975), *cert. denied* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187; *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328 (W.D.Pa. 1977); *Peters v. Middlebury College*, 409 F.Supp. 857 (D.Vt.1976); *Cussler v. University of Maryland*, 430 F.Supp. 602 (D.Md. 1977); *Sanday v. Carnegie-Mellon University*, 15 EPD ¶ 8088 (W.D.Pa.1976); *Smith v. University of North Carolina*, 19 EPD ¶ 9040 (M.D.N.C.1979); *O'Connell v. Teachers College, Columbia University*, 8 EPD ¶ 9518 (S.D.N.Y.1974); *Winsey v. Pace College*, 9 EPD ¶ 10,150 (S.D.N.Y.1975).

Another hardship facing the plaintiff at the beginning of the litigation was the fact that the problems of proof in a sex discrimination case were particularly difficult. It is well settled that the plaintiff in a Title VII trial carries the initial burden imposed by the statute of establishing a *prima facie* case. This may be done by showing that: 1) the plaintiff belongs to the protected class; 2) that she applied and was qualified for the job for which the employer was seeking applicants; 3) that, despite her qualifications, she was rejected; and 4) that, after her rejection, the position remained open and the employer continued to seek applicants from persons of the plaintiff's qualifications. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Direct proof of discriminatory intent is not required in order to make a *prima facie* showing, but the fundamental issue is discriminatory motivation and the plaintiff carries the ultimate burden of making that showing by a preponderance of the evidence. *Naraine v. Western Elec. Co., Inc.*, 507 F.2d 590, 593 (8th Cir. 1975). Evidence of intent is frequently purely statistical, and the plaintiff's attorney must be prepared to compile statistical data and examine witnesses on the significance of that data.

In addition to the complexity of working with statistical proof, counsel is faced with the problem that discrimination is subtle, more often than not. In the instant case, this was especially true because of the aura of liberalism surrounding academic institutions. Can a bastion of academic freedom tolerate discrimination in its midst? Prejudice would seem to be the antithesis of all the University stands for, and without a "smoking gun," that presumption of openness was difficult to challenge.

The risk involved to counsel was increased by the fact that in proving discrimination it became necessary to attack directly the exercise of scholarly judgment which is so much a part of academic freedom. *Keyishian v. Board of Regents of New York*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967); *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). Because respect for that judgment is so deeply ingrained in those who are not constituents of an academic institution, it would have been easy to defer to the decision of those "who are learned in the very field of endeavor that the applicant for tenure claims expertise." *Lynn v. Regents of University of California*, 656 F.2d 1337 (C.D.Cal.1979).

In addition to the proof problems inherent in the prosecution of an action of this sort, the contingencies related to eventual payment increase the burden on counsel. Over the eight years of work on the instant case, plaintiff's counsel have received no payment of legal fees for services performed from any source. (Petition of Sprenger, Olson & Shutes at p. 14.) For the Sprenger firm, 21% of the hours charged during the first 2.4 years of the firm's existence were spent on the Rajender litigation. Thirty percent of Cosgrove's total recorded time for the years 1975–79 was also spent on the litigation. Much other employment, of necessity, was precluded by virtue of the significant time investment in *Rajender.* Total expenses incurred by the Sprenger firm are $91,826.53, $52,228.38 of which was incurred on the merits. The Johnson, Sands firm has incurred expenses of $21,728.09.

Delay in payment is always a concern in protracted litigation where the ongoing demands of maintaining a law firm create cash flow problems for counsel attempting to make ends meet. Monthly payment as the litigation progresses enables one to invest the income or allocate it for other use; the petitioners in the instant case were denied that opportunity.

It is the opinion of this Court that class counsel have met their burden, albeit heavy, in proving an entitlement to their requested multiplier of 1 for the risk factor.

Finally, the Court turns to an appraisal of the quality of the attorneys' work in deciding whether an additional increase in the lodestar calculation is justified. The quality factor has been interpreted to include a degree of skill either above or below that expected for lawyers of the caliber reflected in the hourly rates, and an increase or decrease may be considered only as a reflection of that exceptional performance. *Lindy II*, 540 F.2d at 118. The Court of Appeals for the District of Columbia stated that an "upward adjustment for quality is appropriate only when the attorney performed exceptionally well or obtained an exceptional result for the client." *Copeland v. Marshall*, 641 F.2d 880, 894 (D.C.Cir. 1980). In the *Rajender* action, the significant and unexpected result evidences the existence of outstanding advocacy.

Although the defendants have attempted to minimize the benefits obtained by the class as a result of the litigation, it is the opinion of this Court that those benefits are substantial. The Consent Decree, which remains in effect until January 1, 1989, contains the essential terms of the settlement, and its major provisions can be summarized as follows:

1) The University of Minnesota is permanently enjoined from discriminating against women on the basis of sex with respect to the terms and conditions of employment for all academic non-student employees.

2) Dr. Rajender is to receive a compensatory award of $100,000.00.

3) A quota is established for the Chemistry Department under which two of the next five persons hired into tenure or tenure-track positions must be women.

4) A preference applies to approximately equally well qualified women with respect to hiring for faculty positions in each academic unit in which women are underrepresented in employment in comparison with the applicable availability pool.

5) Each academic unit is required to establish written, sex-neutral criteria and evaluation procedures for (i) hiring, (ii) salary review and adjustment, (iii) contract renewal, and (iv) the granting of tenure and promotions. Each academic unit is also required to maintain written procedures for annual reviews.

6) The University's "anti-cloning" policy against the hiring of its own graduates or working postgraduates into tenure and tenure track positions is waived whenever an academic unit's applicable applicant flow data indicate that women continue to be underrepresented in employment.

7) All advertising and solicitations for faculty positions must include a specific invitation to women applicants, and additional intensive advertising is required in the event that the percentage of women applicants or "seriously considered" women applicants is less than the percentage of women "available." No person can be hired or placed on the University payroll unless the specific advertising and recruitment procedures are followed.

8) Meaningful statistics maintained on computer, showing the percentage of women among (i) those "available," (ii) "total applications," (iii) "seriously considered" applicants, and (iv) applicants "hired" into each category (tenure, tenure track, and nonregular), must be furnished to each department prior to recruitment.

9) A standing University committee is established to review policies and practices which may result in discrimination against women.

10) A procedure is established for the expeditious submission, hearing, and resolution of individual claims of sex discrimination in faculty employment through proceedings before a Special Master. Such claims may include those which arose at any time after March 24, 1972, and a successful claimant may be awarded such relief as the Special Master deems appropriate, which may include back pay, the position for which the claimant applied, an award of tenure, and costs plus attorneys' fees of up to $6,000.00.

11) A procedure is established for the submission, hearing, and resolution of present or future class-wide claims that a particular policy or practice at the University has a discriminatory impact on women through proceedings before the Special Master.

While the defendants have argued that many of the foregoing benefits preexisted *Rajender* by virtue of Title VII and other state or federal laws and, therefore, cannot be attributed to counsel's efforts, this Court is compelled to point out the fact that prior to this lawsuit whatever rights properly belonged to the class were largely illusory because, as the evidence has shown, the defendants were ignoring them. As a result of the *Rajender* action, procedures have been established to ensure that the University of Minnesota is purged of discriminatory employment practices. From this Court's perspective, which is shaped by its understanding of the Civil Rights Act, that accomplishment is far from insignificant.

Two female members of the University faculty, Dr. Claire Woodward and Professor Laura Cooper, testified at the fees hearing in February 1982 that as a result of the Consent Decree many changes have taken place in the University's employment practices. Thorough searches are now conducted for persons to fill faculty vacancies. Grievance procedures not operative before the Decree now result in the informal resolution of claims. In addition, the shroud of secrecy which once enveloped employee evaluations has been lifted with the opening of personnel files.

A $40,000,000. estimate of the economic value to be received by the class likely to

benefit from the terms and conditions of the Consent Decree was prepared by Dr. Karl Egge, an economist, and submitted by class counsel at the fees hearing. Dr. Egge delineated his estimate in the following manner:

1) a value of $30,600,000. in prospective hiring equity and national parity for women faculty at the University of Minnesota at the rank of Assistant Professor and above;

2) about 10% of the above or $3,100,000. of similar benefits to all other academic women at the University;

3) about $600,000. to Dr. Rajender and two other chemistry positions for women; and

4) up to the remainder for retrospective relief to women not hired, promoted, or paid below a comparable male.

Taken as a whole, the settlement in *Rajender* is the largest one ever to be negotiated in an academic setting. Its continued vitality is evidenced by the fact that 25 to 30% of this Court's judicial time is spent reviewing the reports of the Special Masters, consulting with University and class representatives and considering any appeals from the Masters' recommended orders. To date, more than 250 sex discrimination cases have been filed against the University, based upon the Consent Decree.

▉ This Court's assessment of the benefits conferred by this litigation attests to the superior quality of counsel's work. Their persistence in the face of the defendants' often inflexible behavior, their thoroughness in the preparation of their legal work product, their responsiveness to the class members, their innovative prosecution, and their thoroughly professional conduct enabled them to achieve the remarkable result which amply justifies the requested increase in the lodestar.

In addition to the hours expended on the merits which were figured into the lodestar calculation, the Sprenger firm has included in its fee request a base fee of $62,843.75 for time spent on post-settlement administration. The firm's total is derived from 502.75 hours at $125. per hour. In light of this Court's findings that an hourly rate of $125. is not unreasonable in this community for attorneys with the background and expertise of the members of the Sprenger firm, the Court finds this request for post-settlement fees to be reasonable.

The Sprenger firm's expenses incurred on the merits total $52,228.38, with additional expenses of $3,498.62 incurred on post-settlement administration. The Johnson, Sands firm's expenses incurred on the merits total $4,191.57. These figures include experts' fees and disbursements for transcripts and photocopying. The Court finds these costs to be reasonable.

The final items in the petition are the base fees for fee application time and the expenses incurred in the preparation thereof. The Sprenger firm requests $133,343.75 as a base fee (1,066.75 hours at $125. per hour) and $36,099.53 for expenses. Johnson, Sands asks $19,560.00 as a base fee (244.50 hours at $80. per hour) and a total of $17,531.52 for expenses. Although the defendants argue that the wording of the Consent Decree precludes an award to class counsel for time spent and expenses incurred in processing their fee application, it is this Court's opinion that the Consent Decree provision has been interpreted too narrowly by the defendants. The Court of Appeals for the Eighth Circuit in *Jorstad* found that compensation for time necessarily spent in preparing a fee application was appropriate and justified in cases where attorneys' fees are authorized by statute because, " 'the fees are not paid out of the plaintiffs' recovery,' " and, therefore, do not reduce their benefits. *Jorstad* 643 F.2d at 1314, quoting *Prandini v. National Tea Co.*, 585 F.2d 47, 52–53 (3rd Cir. 1978). Such is the situation in the instant case, and the Court finds the requested sums to be fair and reasonable. Consequently, the final award will not be reduced by the amount requested for time and expenses devoted to the preparation of the fee petition.

In conclusion, IT IS HEREBY ORDERED That the following award is to be granted:

ATTORNEYS' FEES:  Sprenger Firm

| | |
|---|---|
| A. Base fee for time spent on merits: | $ 372,250.00 |
| B. Increase of 1.00 for risk on the merits: | 372,250.00 |
| C. Increase of 1.00 for quality on the merits: | 372,250.00 |
| D. Base fee for time spent on post-settlement administration (502.75 hours at $125/hour): | 62,843.75 |
| E. Base fee for time spent on application (pre-and post-settlement application) (1,066.75 hours at $125/hour): | 133,343.75 |
| TOTAL FEES: | $1,312,937.40 |

EXPENSES:

| | |
|---|---|
| A. Legal assistants and law clerks: | Overhead |
| B. Expenses incurred on the merits: | 52,228.38 |
| C. Expenses incurred on administration post-settlement: | 3,498.62 |
| D. Expenses incurred on application: | 36,099.53 |
| TOTAL EXPENSES: | $ 91,826.53 |
| Total fees and expenses of Sprenger, Olson & Shutes, P.A.: | $1,404,763.90 |

ATTORNEYS' FEES:  Terry Cosgrove and Johnson & Sands Firm

| | |
|---|---|
| A. A base fee for time devoted to the case on its merits (2,086.50 hours at $80/hour): | $ 166,920.00 |
| B. Increase of 1.00 for risk on the merits: | 166,920.00 |
| C. Increase of 1.00 for quality on the merits: | 166,920.00 |
| D. A base fee for time devoted to the application included in the Second Amended Application (244.50 hours at $80/hour): | 19,560.00 |
| E. A base fee for time devoted to the application subsequent to the preparation of the Second Amended Application (109.75 hours at $80/hour): | 8,780.00 |
| TOTAL FEES: | $ 529,100.00 |

EXPENSES:

| | |
|---|---|
| A. Disbursements (per initial application): | $ 2,896.57 |
| B. Paralegals (per initial application): | 1,295.00 |
| C. Disbursements billed for or incurred subsequent to the preparation of the Second Amended Application: | $ 17,531.52 |
| TOTAL EXPENSES: | $ 21,723.09 |
| Total fees and expenses of Terry Cosgrove and Johnson, Sands, Lizee, Fricker & McCloskey: | $ 550,823.09 |

## C. Status of the Defendants.

The defendants, in anticipating an award of attorneys' fees to class counsel, argue that it is appropriate for the Court to apply a negative ten percent multiplier because of the University's status as a non-profit, publicly-supported educational institution. The defendants further argue that a judgment against the University for fees in this case will not be paid by the faculty members who made the employment decisions in question but will be borne eventually by the taxpayers of the State of Minnesota or the students at the University in the form of increased tuition.

The Court of Appeals for the District of Columbia was faced with a similar issue in *Copeland v. Marshall* and resolved the dispute in favor of the fee petitioner. *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir. 1980). In awarding attorneys' fees resulting from the successful prosecution of a gender discrimination suit against the Department of Labor, the *Copeland* Court stated that the amount of the fee should not depend on the identity of the losing party. The Court cited the controlling statute, 42 U.S.C. § 2000e–5(k) (1976), and concluded that its decision was fully consistent with the policies behind the attorneys' fee provision of the statute. According to the *Copeland* Court, the primary purpose of the statute is "to help persons obtain competent counsel with which to vindicate civil rights through litigation." *Copeland* at 895. The Court decided that the plain language of the statute, which establishes that the United States shall be liable for costs the same as a private person, suggests that "the incentive to ferret out discrimination ..." should be no less "when the government is the defendant." *Id.*

The Court also pointed out the fact that a second policy underlying fee awards is to deter discrimination by establishing the prospect of liability for an attorney's fee.

It added that "We do not think that the incentive for the government to refrain from discrimination should be any less than for private employers." *Id.*

Nor, in the instant case should the Court defer to the University of Minnesota simply because it is a non-profit, publicly-supported institution. This Court can imagine no situation more anomalous than one in which the statute designed to encourage compliance with and enforcement of civil rights laws is interpreted to grant special favors to one class of defendants because of their status.

As a consequence, no negative multiplier shall be applied to the final assessment of fees.

The defendants finally request that the Court minimize the impact of the award on the University by permitting its payment over a period of years. It is the opinion of this Court that payment over a period of two years from the date of the entry of judgment would be reasonable under the circumstances. Therefore, IT IS HEREBY ORDERED That the attorneys' fees award shall be paid to class counsel over a period of two years at an interest rate of eleven percent.